# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411
Telephone  (213) 625-3900
Facsimile  (213) 232-3255
Geragos@Geragos.com

MARK J. GERAGOS        SBN  108325
mark@geragos.com
BEN J. MEISELAS         SBN 277412
ben@geragos.com
MATTHEW M. HOESLY      SBN  289593
mhoesly@geragos.com

**ZUMPANO PATRICIOS & POPOK PLLC**
MICHAEL S. POPOK        (NY) 2475226
mpopok@zplaw.com
(*Pro Hac Vice* Motion Pending)
MITCHELL G. MANDELL     (NY) 2042828
mmandell@zplaw.com
(*Pro Hac Vice* Motion Pending)
2042828417 Fifth Avenue, Suite 826
New York, New York 10016
Telephone: (212) 381-9999
Facsimile: (212) 320-0332

*Attorneys for Plaintiff,*
MYCHANNEL, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MYCHANNEL, INC.,** a Delaware corporation, | Case No.: |
| | **COMPLAINT FOR DAMAGES** |
| Plaintiff, | 1) **BREACH OF MUTUAL NON-DISCLOSURE AGREEMENT** |
| v. | 2) **PROMISSORY ESTOPPEL** |
| **KANYE OMARI WEST,** Individually, and **YEEZY APPAREL LLC,** a | 3) **VIOLATION OF THE DUTY OF** |

- 1 -

California limited liability company,

Defendants.

**LOYALTY UNDER 15 Pa.C.S. § 8422(a) and § 8447(c)**

4) **VIOLATION OF THE OBLIGATION OF GOOD FAITH AND FAIR DEALING UNDER 15 Pa.C.S. § 8422, § 8447(d), and 15 Pa.C.S. § 8415(c)(11)**

5) **BREACH OF FIDUCIARY DUTIES**

6) **UNJUST ENRICHMENT**

7) **QUANTUM MERUIT**

**JURY TRIAL DEMANDED**

Plaintiff MyChannel, Inc. ("MYC" or "Plaintiff"), by and through its undersigned counsel, Geragos & Geragos, APC and Zumpano Patricios & Popok, PLLC, brings this Complaint against Defendant Kanye Omari West, individually ("Kanye" or "Mr. West"), and Defendant Yeezy Apparel LLC, a California limited liability company ("Yeezy") (collectively, "Defendants"), and states as follows:

**INTRODUCTION**

The business relationship between Kanye and his Yeezy brand on the one hand, and MYC and its founders on the other, began with Defendants' lavish promises to MYC of millions of dollars in economic reward, the formation of a lucrative partnership providing millions more, and in return, MYC providing tens of thousands of hours of investment in Yeezy in reliance on those promises and the MYC-Kanye partnership. Today, there should be in place a flourishing Yeezy e-commerce business powered by MYC's ground-breaking video technology and the vision of its founders. Instead, the relationship concluded with Defendants cutting off contact with

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

- 2 -

MYC and the misappropriation of MYC's proprietary and confidential technology and information to fuel the e-commerce engine of Mr. West's Yeezy brand.

Mr. West sits at the intersection of music, visual arts, fashion, and business. He recently tweeted that he saw himself as a "product guy at my core. To make products that make people feel an immense amount of joy and solve issues and problems in their life, that's the problem-solving that I love to do." MYC, in its own unique way, also creates "joy" and solves problems. It is a pioneering video and e-commerce technology company led by a group of highly-successful Black entrepreneurs, advisors and investors, and it invented a brand new way of using novel technology and artificial intelligence to seamlessly marry e-commerce to video content, including music videos and commercials.

The founders of MYC reasonably relied on a series of promises made by Mr. West and other leaders in his organization that for six (6) months convinced them to focus 100 percent of their attention on Kanye and Yeezy, and to invest more than $7 million in company resources for good measure. In fact, the MYC founders and other personnel moved from their Pennsylvania headquarters to Yeezy's headquarters (first in California and then in Illinois) and worked full-time for Defendants, all at Mr. West's insistence. The resulting oral joint venture partnership that arose between MYC and Mr. West further encouraged Plaintiff to devote millions of dollars in time and resources to the venture, to develop, build-out, operate and manage the Yeezy e-commerce business. During this time, and reflecting the partnership and the promises

made, Mr. West referred to MYC as "YZY Tech" including to Defendants' global brand partners and went so far as to refer to MYC's "MyChannel" as "Our Channel." Mr. West also promised in June 2018 to make a $10 million strategic investment in MyChannel. He later inexplicably reneged on his promises seemingly on a whim and walked away from the successful partnership while misappropriating MYC's proprietary and trade secrets, netting Kanye hundreds of millions of dollars off of the back of MYC.

Plain and simple, Kanye and Defendant Yeezy failed to live up to their side of the bargain, and misappropriated and exploited the innovation, proprietary information, and labor of MYC to benefit Yeezy's e-commerce business without compensation. Mr. West and Yeezy: (a) breached the parties' oral partnership agreement; (b) prevented MYC from earning millions of dollars in fees; (c) encouraged MYC to invest millions of dollars of its own resources and time in the parties' venture; (d) failed to make the $10 million promised investment; and (e) violated MYC's non-disclosure agreement ("NDA") (**Exhibit A** hereto) by using a copycat video e-commerce technology to drive sales of Kanye-branded merchandise on their *Sunday Service* video social media platform launched in 2019 ("*Sunday Service*").

MYC and MYC alone in the industry provides, through its proprietary video platform, a unique, "white label," in-video interactive and immersive "shoppable" e-commerce content experience (the "MYC Video Platform") that works seamlessly

with all video content.  The combination of MYC's paradigm-shifting Video Platform and technological prowess, and Mr. West's artistic content, should have taken the world by storm, providing a highly profitable venture for both.

The collaborative partnership between Mr. West and the MYC founders started promisingly in the Spring of 2018.  The ultimate goal of the parties' venture was to maximize revenues for Yeezy's merchandize by utilizing a "white label" version of MYC's Video Platform to increase site traffic and conversion ratios, as well as to generally enhance the user/customer experience and share the resulting profits between them.  In order to launch the enterprise and continue the goodwill between the two companies, MYC and Yeezy entered into the NDA in May 2018 to protect MYC's proprietary information, trade secrets and intellectual property, including the inner-workings of the MYC Video Platform, from Yeezy's misappropriation and use without compensation.  It is this NDA that Yeezy and Mr. West breached when they launched Mr. West's *Sunday Service* and its e-commerce component that included a knock-off of the MYC Video Platform.

During a six month stretch in 2018, the founders of MYC and a team of people they deployed to work on Yeezy, at Mr. West's insistence, worked around the clock and almost exclusively for Defendants.  To build out the MYC Platform and make it work seamlessly with the Yeezy brand and Mr. West's video content, MYC engaged programmers, product developers, licensors, and other management personnel who worked tirelessly and without complaint 12-18 hours per day for six months straight to

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

accomplish the venture's goals.   In addition, MYC's founders relocated first to Calabasas, California and then to Chicago, Illinois, all at Mr. West's urging, to continue their uninterrupted work for Yeezy.

But by late 2018 it became clear to MYC's founders that Mr. West had no real intention of fulfilling his end of the bargain to invest in MYC and to use MYC's proprietary platform to power Yeezy's e-commerce business.   Instead, after Kanye learned all that he could from MYC and its founders, he abruptly attempted to terminate the parties' oral partnership, refused to invest in MYC or even reimburse it for the millions the company had already sunk into Yeezy's e-commerce business, and misappropriated MYC's proprietary information and technology to use it on his newly-launched *Sunday Service*.   Mr. West's channel became a rousing success, leading in his words to merchandise sales of over "$1mm a night," demonstrating the sheer magnitude of the economic loss MYC has suffered.

## **PARTIES**

1.     Plaintiff MYC is a Delaware corporation with its principal place of business located in Chalfont, Pennsylvania.   MYC was founded in 2014 by Julian Duggin ("Mr. Duggin"), its Chief Executive Officer, and Gibran Gadsden ("Mr. Gadsden"), its Chief Operating Officer.   In addition, its Board of Directors, investors and advisors are some of the most successful entrepreneurs and investors in the country.   As a thought leader in the area of video technology, MYC's business focuses on two primary areas: (a) it uses proprietary technology to bring social media, live and

on-demand video channels to the workplace to enhance employee engagement, including building and managing "white label" platforms used by some of the largest corporations and institutions in America; and (b) using licensed video frame analysis Artificial Intelligence ("AI") technology, it developed the MYC Video Platform that uses a proprietary sentiment analysis AI engine for the B2B, B2B2C and B2C spaces, and creates an immersive, seamless shopping experience within third party video content, including music videos and social media videos.

2.      Defendant Kanye Omari West is an individual who is a citizen of the State of California.  He is Defendant Yeezy's principal owner and investor.

3.      Defendant Yeezy is a California limited liability company with its principal place of business located in La Palma, Orange County, California.  Upon information and belief, its sole member is non-party Yeezy LLC, whose members are Mr. West and Mascotte Holdings, Inc., both citizens of the State of California.  Yeezy is the vehicle that Mr. West uses to develop and sell his products, including, upon information and belief, a billion-dollar clothing and sneaker line.

## JURISDICTION, VENUE AND LAW

4.      The Court has diversity jurisdiction over all claims pursuant to 28 U.S.C. § 1332, as the matter in controversy is between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Defendant Yeezy and Defendant West, both of whom are residents of the State.

6.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the majority of witnesses are located here and a substantial portion of the events giving rise to MYC's claims occurred in the Central District of California. In addition, Defendants: (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws within this District; (b) currently do substantial business in this District; and (c) are subject to personal jurisdiction in this District.

7.     The substantive law of the Commonwealth of Pennsylvania applies to the Claims herein because: (a) the parties' NDA requires it as it relates to a breach of the NDA; and (b) MYC has been damaged in Pennsylvania, the situs of its corporate headquarters, by Defendants: (i) refusing to honor their partnership and pay MYC the tens of millions of dollars owed; and (ii) retaining the benefit of MYC's work without compensation.

## FACTUAL ALLEGATIONS

### MYC: A Video Technology and E-Commerce Powerhouse

8.     MYC was founded in 2014 by Messrs. Duggin and Gadsen who are both successful Black entrepreneurs. The bedrock for the strong corporate ethos and culture which make up MYC's DNA is the commitment of the founders and its investors and

advisors to: (a) create one of the world's great technology companies; and (b) further the cause of other minority-owned businesses.

9.      MYC's founders and investors represent some of the most successful business people in America, and are admired civic and community leaders as well, with ties to the most prestigious corporations, charities, and institutions of higher education in the United States.

10.     MYC's core business prior to entering into its venture with Defendants is providing institutions of higher education and companies, including those in the healthcare and fashion industries, with "social video" in the workplace. MYC creates "white label" video channels for companies and institutions using its proprietary technology to create interpersonal and collaborative experience through live and on-demand video programming. MYC's technology drives customer engagement in a B2B and B2B2C environment, as well as employee engagement, by implementing a unique approach to the enterprise collaborative space, to create interactive, immersive, and bidirectional media experiences for users across multiple devises, including mobile, for live and on demand video content.

**The MYC Video Platform for B2C E-Commerce**

11.     In and around 2016, the MYC founders focused on applying the company's technological prowess to the B2C e-commerce space. Specifically, it developed the MYC Video Platform to transform ordinary streaming or on-demand video content into interactive and immersive "shoppable" content to allow the

consumer to never leave the video experience in order to purchase merchandise featured in the video.

12.     The cutting-edge MYC Video Platform took over sixteen (16) months to develop.  Combining licensed video frame capture and metadata technology with its sentiment analysis AI engine, it: (a) breaks down a video into its individual frames, sometimes numbering into the millions depending upon the video's length; (b) mines the metadata embedded in each frame to isolate individual merchandise depicted; and (c) instantaneously searches the internet for a match, thereby allowing the user to immediately purchase the item without ever leaving the on-demand or live streaming video experience.

13.     With the MYC Video Platform in hand, MYC's founders set about to identify the perfect e-commerce company, innovator and influencer as a match for its technology.

**The MYC Founders Identify Kanye and Yeezy as a Match**

14.     MYC identified that Mr. West and the Yeezy brand could benefit from the MYC Video Platform.  The MYC founders thought Defendants would be a good match because of Mr. West's at least public commitment to empowering fellow Black entrepreneurs, the hallmarks of MYC's own ethos.  <u>MYC reasonably believed that in Defendants they had found business partners who would live up to their agreements and promises.  Later events proved them wrong.</u>

GERAGOS & GERAGOS, APC
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

15.     The MYC founders, through mutual connections, made contact with Mr. West in April 2018 to discuss a partnership.

16.     Within a very short time, Messrs. Duggin and Gadsen had a meeting set up with Kanye's business manager. At their own expense, the MYC founders immediately flew from their headquarters in Pennsylvania to Mr. West's business operations located at the time in Calabasas, California.

17.     Upon arrival, the MYC founders were informed that in addition to the formal meeting with him a couple of days later, Mr. West would meet with them that very night to discuss the MYC Video Platform and its application to the Yeezy brand.

18.     In the wee hours of the next day after their arrival, Messrs. Duggin and Gadsen met with Mr. West in his home and discussed the MYC Video Platform.  Mr. West's response, spoken in front of his inner circle and entourage of business advisers, was exactly what MYC's founders hoped they would  hear, when Kanye exclaimed: "*I love it; let's do this*."

**Kanye and MYC Become Partners**

19.     More than that, Mr. West told the MYC founders that he wanted them to remain in Calabasas, California from that moment forward, to be his partners in the venture, and to work exclusively and around the clock for their new venture to integrate the MYC Video Platform into Yeezy's existing e-commerce business.

20.     This was a huge commitment of time and resources for MYC.  But, Mr. West and other senior leadership in his organization promised that if the MYC

- 11 -

founders relocated to California and devoted all of MYC's time, attention and resources to Yeezy and Kanye, MYC would be handsomely rewarded including by: (a) being in partnership with Mr. West; (b) having MYC power Yeezy's e-commerce business and share in the profits from increased sales, and (c) Mr. West investing $10 million and other resources into the parties' venture.

21.    In reasonable reliance on these promises, in furtherance of the parties' partnership, and at Mr. West's instruction, the MYC founders moved to California in April 2018.  All told, MYC's founders and about a dozen other personnel spent six (6) non-stop months working with Mr. West and Yeezy, to the exclusion of their other work and clients, at considerable expense and without compensation.

22.    When just five months after MYC's arrival in California Mr. West decided to relocate the entire Yeezy operation to Chicago, Illinois, and instructed the MYC founders to move with him, they complied.   Again trusting Mr. West and relying on his promises, the MYC founders did so at their own considerable expense, demonstrating further the depth of their loyalty and perseverance to make the partnership a success.

23.    In or around this same time, on May 2, 2018, to further the partnership and provide confidence that their proprietary technology and ideas would not be ripped off without proper compensation, MYC had Yeezy sign the NDA.   (*See* **Exhibit A**).

24.     In the following weeks and months, MYC's founders and Mr. West along with his key business development manager and advisers, discussed the terms for the integration of the MYC Video Platform and Yeezy.

25.     For example, in an all-day meeting, Yeezy's Chief Executive Officer ("CEO") told the MYC founders that he was personally "blown away" by the MYC technology and the vision of its founders.  He further expressed that he knew that Kanye needed a technological layer in his business in order to take his brand to the next level.  All agreed at that meeting that the MYC Video Platform  was the key to improving the Yeezy customer e-commerce experience, and to drive up sales as a result.

26.     Mr. Duggin and Mr. Gadsden developed with the Yeezy CEO key performance indicators (KPIs) for their venture concerning customer engagement, conversion rates, and resulting sales and sales profit margins, as well as the compensation that MYC would receive from the partnership.

27.     Specifically, the goals of the MYC/Yeezy partnership were to: (a) increase Yeezy's site traffic; (b) increase Yeezy's conversion ratio (*i.e.* customer buys); and (c) enhance Yeezy's customer/viewer experience by improving site functionality.

28.     By accomplishing these goals, MYC expected that it would be compensated by a combination of fees, base e-commerce commissions, and additional

GERACOS & GERACOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

performance incentives associated with the growth of the Yeezy e-commerce operation as a result of MYC's efforts.

29.   The parties also developed more specific goals for the partnership and its use of the MYC Video Platform including: (a) supporting the livestreaming/on-demand nature of "shoppable events" for Yeezy; (b) providing customers/viewers with a Kanye-inspired "shoppable experience"; (c) providing immediate unique data sets;                    (d) demonstrating strategic launch relationships across payment processing, marketplace scalability and business development; and (e) providing customers/viewers with a consistent technology experience regardless of mobile/desktop/laptop usage.

30.   From these conversations, negotiations, and mutual agreement on the goals of the collaboration, and after considerable negotiations between Defendants and MYC, Mr. West through Yeezy ultimately furnished MYC with a $10 million term sheet in June 2018 (the "Term Sheet") as part of a strategic investment to allow it to develop and build out MYC's Video Platform. (*See* **Exhibit B**).

31.   It is this Term Sheet, coupled with Mr. West's promise of even more economic reward in the future, that understandably encouraged MYC and its founders to go "all in" and devote all of their time and resources to the partnership.

32.   But every time the MYC founders raised the issue of Mr. West actually funding MYC and providing the $10mm promised, they were met with Mr. West's protestations that they were "thinking small," and should instead "focus on bigger

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

revenue and profits" resulting from their partnership.  <u>MYC founders trusted Kanye and pushed ahead.</u>

**MYC Relies on Defendants' Promises and Invests Millions Into the Venture**

33.    In reliance on all of Mr. West's promises and representations about their partnership, MYC deployed almost a dozen programmers and product developers and devoted the full-time resources of its key executives and advisers, including Messrs. Duggin and Gadsden, to the partnership with Mr. West.

34.    Working for Defendants up to 80-hour weeks non-stop for six months, the MYC personnel logged about <u>10,000</u> hours exclusively for Defendants and the partnership.  <u>MYC has to date received no compensation from Defendants for its considerable work and value conferred.</u>

35.    To encourage and entice MYC to make this extraordinary investment of dedicated human capital and corporate money and resources, Mr. West and others in his inner sanctum continuously encouraged MYC to do more and better in return for making the partnership an economic success.

36.    In addition, in reliance on Defendants' promises and entreaties, MYC spent tens of thousands of dollars on video and other technology equipment to invest in the venture, and hundreds of thousands of more dollars on its executives' and personnel's personal living and travel expenses for relocating and living in both California and then Chicago at Mr. West's demand.

**Kanye Rebrands MyChannel to "Our Channel" and "YZY Tech"**

- 15 -

37.     From the outset of the partnership, Mr. West and other Yeezy senior management began publicly referring to MYC as "YZY Tech."  Embracing the new venture in one of his typical bear hugs, Kanye brought the MYC founders with him to meetings with major YEEZY brand partners, such as *adidas*.  At these meetings, Mr. West often introduced Plaintiff to third parties as "YZY Tech," and told the assembled executives that Messrs. Duggin and Gadsden were "doing it right."  This is also an example of Mr. West claiming ideas such as those of MYC as his own.

38.     Throughout the summer months of 2018, negotiations between MYC and Defendants were ongoing while MYC continued to provide uninterrupted services to develop and integrate the MYC Video Platform for Yeezy.

39.     At one point, Mr. Duggin asked Mr. West point blank when the $10 million investment in MYC would be made by Defendants.  In typical Kanye fashion, he responded that Mr. Duggin was worrying too much about "legal issues," and that Yeezy was not run by the legal or business departments, but by the "creative" people like himself and the MYC founders.  MYC and its founders had no reason at that time to doubt Mr. West's sincerity.

40.     Throughout this whirlwind six-month time period, Mr. West also enticed MYC by dangling in front of them a new major opportunity as part of his "MYC as YZY Tech" vision: That  MYC would "power" the Yeezy brand's entire e-commerce division.

41.    Consistent with Mr. West's new vision for MYC and its integration with Yeezy, Mr. West made Mr. Duggin his confidant and business consultant.

42.    Mr. West relied on MYC for a number of key e-commerce projects while he traveled through Africa in October 2018 to finish a new album.  These included MYC: (a) collaborating with  Havas Creative, the global advertising agency responsible for the *adidas* and Yeezy brand collaboration, to develop a campaign for the release of the Yeezy 350v2 sneakers that leveraged exclusive video content with the MYC Video Platform; and (b) working with Salesforce to optimize and migrate the existing YeezySupply.com website and e-commerce technology stack from Shopify.  Again, MYC and its founders were not compensated for their considerable efforts or for the benefit conferred on Defendants.

43.    It was around this time that Mr. West, co-opting further the MYC intellectual property and proprietary technology as his own, rebranded the MYC Video Platform as "Our Channel."  Just as when the MYC founders heard Mr. West rebrand their company as "YZY Tech" to third parties, and now their "MyChannel" as "Our Channel," they believed that Mr. West was just being enthusiastic and supportive of their partnership, leading them to work even harder.  They never believed at that time that Defendants planned to misappropriate their technology and ideas for their own purposes and leave MYC in the dust.

44.    As the business relationship between MYC and Defendants continued to grow, the MYC founders even went so far as to introduce Mr. West to their leading

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

investor and advisor, a renowned business owner and powerhouse leader in the Black business community, to provide assistance to Yeezy and evaluate it as an investor.

45.     Mr. West flew Yeezy's Chief Financial Officer to meet this investor and advisor of MYC's, and to open Yeezy's financials and books for his review.  This also allowed MYC to confirm that Yeezy had the wherewithal to make the $10 million investment and more in MYC, that it was a suitable investor and partner.

46.     But everything changed for the worse for MYC and its founders by October 2018.  By this point, MYC was out more than $7 million  in expenses, including to pay additional employees required to build out the MYC Video Platform for Defendants and to pay for equipment and living expenses.

47.     Growing    tired   of   Mr.   West's   continued   failed   promises   and representations over the prior six (6) months, *during a time when publicly, Mr. West was extolling the virtue of supporting Black entrepreneurs like themselves*, Mr. Duggin and Mr. Gadsden began pressing Kanye as to when they could expect to be paid for their efforts and receive the benefits of their partnership.  In response, he feigned disinterest in the venture, and while in Uganda, claimed some untrue perceived slight as a pretext to cut ties with MYC and its founders.

48.     Tired and frustrated, Mr. Gadsden returned home to Pennsylvania, while Mr. Duggin awaited Kanye's return from Uganda.

49.     Kanye and Mr. Duggin met in person in October 2018.  During the meeting, Mr. Duggin pressed Mr. West for the money promised and the payoff for the

hard work performed. During this face-to-face, Mr. West again promised to move forward with the partnership with MYC, but with a new leadership team at Yeezy.

50.    Despite these new promises by Mr. West, and with no money repaid to or invested in MYC, Mr. Duggin returned home to MYC empty-handed. Soon thereafter, all communication with Mr. West and Yeezy ceased, leaving MYC and its founders in the lurch and out millions of dollars.

**Kanye's *Sunday Service* Misappropriates MYC's Technology and Ideas**

51.    A few months after Mr. West disappeared and left MYC holding the proverbial bag, he launched his *Sunday Service* in early 2019. On this channel, Kanye's gospel group performed weekly musical worship and led prayer sessions, but with an e-commerce twist that uses the streaming video content from *Sunday Service* to the drive sales of Yeezy-branded products and merchandise.

52.    After visiting Yeezy's website, it became patently obvious to MYC's founders that Defendants had misappropriated its proprietary technology and the functionality of the MYC Video Platform, albeit using an inferior version without the key "shopability" functionality and integrated it into the channel.

53.    Incredibly, it was not just MYC's founders that noticed the identity between the *Sunday Service* e-commerce component and MYC's proprietary information and technology. *Some of Mr. West's closest confidents and business*

*advisors* reached out to MYC's founders noting the similarities, and even went so far *as to compliment* MYC for what they reasonably believed was its work.

54. Sometime after the launch of Mr. West's *Sunday Service*, Mr. Duggin and Mr. Gadsden emailed Mr. West's manager to offer to work together and make the *Sunday Service* e-commerce platform function more effectively by using the MYC Video Platform directly. They received no response.

55. Obviously not chastened by ripping off MYC in the initial version of the *Sunday Service*, Defendants' video content soon incorporated a "shoppable" functionality which is specifically prohibited by the NDA.

56. On March 4, 2020, Kanye, on his "teamkanyedaily" Instagram page, boasted about the success of merchandise sales on the *Sunday Service* that was using the misappropriated MYC technology: "*We were doing one million dollars a night in merch* [sic]" (emphasis added). That represents an admission by Defendants that the revenue stream resulting from the misappropriation of MYC's technology and other confidential and proprietary information approaches over $350 million per year.

57. It has become painfully obvious to MYC that it will never receive the $10 million investment promised, reimbursement for the millions more invested by it in the parties' partnership, or any of the future profits, without a fight.

## FIRST CLAIM FOR RELIEF

### Breach of Mutual Non-Disclosure Agreement
### (*Against Defendant Yeezy*)

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

58.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

59.   Plaintiff and Defendant Yeezy entered into the NDA. A true and correct copy of the NDA is attached hereto as **Exhibit A**.

60.   Section 4 of the NDA provides in relevant part that "[a]ll of [MYC]'s Confidential Information and Evaluation Material [as defined in the NDA] are the property of [MYC] and no license or other rights to [MYC]'s Confidential Information and Evaluation Material is granted or implied hereby . . . ."

61.   Confidential Information is broadly defined in the NDA as: any financial, technical and non-technical information related to a party's business and current, future and proposed products and services  of each of the parties, including for example and without limitation, each party's respective information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing . . . ." .

62.   Additionally, Section 4 of the NDA provides that "[a]ll of [MYC]'s Confidential Information  . . . . are the property of [MYC] and no license or other rights to [MYC]'s Confidential Information . . . . is granted or implied hereby."

63.   Further, Section 9 of the NDA provides that it "shall govern all communications between the parties . . . [and] will continue in perpetuity . . . ."

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

64.    The NDA is binding on Yeezy, and on its employees, agents, officers, and legal counsel.  Ex. A, Section 4.

65.    Plaintiff and Defendant Yeezy expressly agreed that MYC's proprietary and intellectual property would not be used by and/or shared with any unauthorized parties, including Yeezy, without MYC's prior written consent.

66.    Defendant Yeezy breached the NDA by using MYC's Confidential Information, including the technology that comprises the MYC Video Platform, to launch its own channel with streaming and on-demand video content, *Sunday Service*, with shoppable content.

67.    As a direct result of Defendant Yeezy's misappropriation and theft of Plaintiff's proprietary information in violation of the NDA, Plaintiff has suffered and is entitled to: (a) compensatory damages in an amount to be determined at trial; (b) disgorged profits representing the amount obtained by Defendant Yeezy in operating its e-commerce business, including on *Sunday Service;* and (c) reasonable attorneys' fees and costs pursuant to Section 13 of the NDA.

## SECOND CLAIM FOR RELIEF

### Promissory Estoppel
### (*Against All Defendants*)

68.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

69.    Defendants West and Yeezy made numerous promises and representations to Plaintiff throughout their six-month business relationship as alleged

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

above.  These promises included: (1) investing $10 million into MYC; (2) creating and running Yeezy's e-commerce division in partnership with MYC and sharing in the resulting profit; (3) maintaining the confidentiality of Plaintiff's proprietary technology pursuant to the NDA;  (4) compensating Plaintiff for its thousands of hours of  labor provided to Defendants over the course of six months; and (5) reimbursing it for other investments made, including equipment acquisition and living expenses while working for Yeezy and the partnership.

70.    Defendants reasonably should have expected their promises to induce MYC to act in reliance on their promises.

71.    Reasonably relying on Defendants' promises, Plaintiff: (a) invested over $7 million in employee time; (b)   purchased tens of thousands  of dollars in equipment; (c) incurred more than $100,000 in living, traveling, and relocation expenses to work full-time at Yeezy's headquarters in California and then later in Illinois; and (d) shared valuable knowledge and proprietary information, including key aspects of MYC's Platform and how to use its information to customize Defendants' e-commerce brand.

72.    Injustice can be avoided only by enforcing Defendants' promises. Allowing Defendants to use Plaintiff's proprietary information for their benefit without compensation and leaving MYC uncompensated for its investment of millions in resources and expenses based on Defendants' promises, is inequitable.

73.     As a direct result of Defendants' wrongful conduct, Plaintiff is entitled to:   (a) compensatory damages in an amount to be determined at trial, and (b) disgorged profits representing the amount that Defendants obtained in operating their e-commerce business, including on *Sunday Service*.

### THIRD CLAIM FOR RELIEF

**Violation of the Duty of Loyalty Under**
**15 Pa.C.S. § 8422(a) and § 8447(c)**
***(Against Defendant West)***

74.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

75.     Pennsylvania law governing the formation of a partnership provides in relevant part that: "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." 15 Pa.C.S. § 8422(a).

76.     Plaintiff and Defendant West clearly and mutually intended to associate to carry on as co-owners of a business for profit — a partnership — in or around August 2018. They did so for the purpose of building Yeezy's e-commerce division, specifically to use the MYC Platform to power Yeezy's e-commerce channels.

77.     Through multiple meetings and oral and written exchanges, Plaintiff and Defendant West agreed on the terms to govern the oral partnership.

78.     Under the oral partnership agreement, Plaintiff would run Yeezy's e-commerce division for Kanye, and would build out the tech layer of Yeezy.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

79.    Pursuant to 15 Pa.C.S. § 8447(c), a fiduciary relationship exists between Plaintiff and Defendant West, and his fiduciary duties as partners include the duty to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner . . . from the appropriation of a partnership opportunity."

80.    As an interactive and immersive video channel displaying some of the characteristic features of MYC's designs, technology, and other proprietary information, including "shopability," Defendant West's *Sunday Service* was an opportunity that: (1) was closely tied to the partnership's existing and/or prospective line of business, i.e., e-commerce through novel technology and artificial intelligence designed to seamlessly marry e-commerce to video content; (2) would have competitively advantaged the partnership; and (3) was one that the partnership had the financial ability, knowledge, and experience to pursue. As such, it was a partnership opportunity.

81.    Defendant West's actions to usurp the opportunity of the parties' partnership were intentional, or done with reckless disregard for the rights of his fellow partner, MYC.    He intentionally misappropriated MYC's proprietary information, which was meant to support a shared venture, purely for his own benefit, without regard for the right of MYC to share equally in the partnership and the income and profits generated by the partnership.

82.    Defendant West usurped this opportunity for himself when, upon information and belief, he made millions of dollars from *Sunday Service* without

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

- 25 -

sharing any of profits with MYC. He failed to act for the benefit of the partnership, and instead, acted in a manner to promote his own interests.

83.    As a direct result of Defendant West's foregoing wrongful conduct, Plaintiff is entitled to: (a) compensatory damages in an amount to be determined at trial; (b) disgorged profits representing the amount obtained by Defendant West in operating his e-commerce business, including on *Sunday Service;* and (c) punitive damages.

///

///

## **FOURTH CLAIM FOR RELIEF**

### **Violation of the Obligation of Good Faith and Fair Dealing under 15 Pa.C.S. § 8422, § 8447(d), and 15 Pa.C.S. § 8415(c)(11) (*Against Defendant West*)**

84.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

85.    Pursuant to 15 Pa.C.S. § 8447(d), "[a] partner shall discharge the duties and obligations under this title or under the partnership agreement and exercise any rights consistent with the contractual obligation of good faith and fair dealing."

86.    Pursuant to 15 Pa.C.S. § 8415(c)(11), partners cannot "[v]ary the contractual obligation of good faith and fair dealing under section 8447(d)."

87.    Defendant West's obligations to pay Plaintiff for its services and not use Plaintiff's proprietary information without Plaintiff's consent were within the

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

contemplation of the parties when the partnership was formed.   Therefore, he is subject to the duty of good faith and fair dealing regarding these obligations.

88.     Defendant West breached his duties of good faith and fair dealing by failing to compensate Plaintiff for its labor, expenses, and expertise, as well as by independently using Plaintiff's proprietary information for a partnership opportunity, as described herein. In doing so, he was not honest in fact and evaded the spirit of the parties' bargain.

89.     Defendant West's actions were intentional or done with reckless disregard for the rights of Plaintiff.

90.     Defendant West's breach damaged Plaintiff to the extent of its costs, the value of its labor and expertise, and the profits gained by him through his use of the MYC Video Platform that should have been shared with Plaintiff.

91.     As a direct result of Defendant West's aforesaid wrongful conduct, Plaintiff is entitled to: (a) compensatory damages in an amount to be determined at trial; (b) disgorged profits representing the amount obtained by Defendant West in operating his e-commerce business, including *Sunday Service*; and (c) punitive damages.

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duties
### (*Against Defendant West*)

92.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

93.     Defendant West's close collaboration with Plaintiff was founded on a special relationship.

94.     The parties did not deal on equal terms. On Defendant West's side was his overmastering influence while on the other was MYC which justifiably reposed trust in him because of Kanye's status and based on his promises.

95.     Defendant West had a fiduciary duty to live up to Plaintiff's trust by not misusing Plaintiff's proprietary information, as well as its labor and work product, without any intention of providing it with fair and earned compensation.

96.     Defendant West's actions were intentional or done with reckless disregard for the rights of Plaintiff.

97.     Defendant West breached his fiduciary duty when he used Plaintiff's proprietary information, services, and expertise purely for his own gain and when he failed to pay Plaintiff for the services it provided at his request and for his benefit.

98.     As a direct result of Defendant West's aforesaid wrongful conduct, Plaintiff is entitled to: (a) compensatory damages in an amount to be determined at trial; (b) disgorged profits representing the amount obtained by Defendant West in operating his e-commerce business, including *Sunday Service*; and (c) punitive damages.

## SIXTH CLAIM FOR RELIEF

**Unjust Enrichment**
***(Against All Defendants)***

99.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

100.   MYC conferred benefits on Defendants by contributing thousands of hours of labor, proprietary technology, design, and expertise that MYC had spent years developing, as well as investing in equipment and covering relocation and living expenses, all to integrate the MYC Platform with Defendant's Yeezy e-commerce business.

101.   Defendants engaged Plaintiff, praised its services, brought its founders into its inner circle, and requested that Plaintiff continue to build the brand as Defendants envisioned it for Yeezy's video channel and e-commerce division.

102.   It would be inequitable for Defendants to retain the benefits conferred on them by MYC without fair and appropriate compensation.  Defendants and their brand benefited immensely from their exposure to and use of Plaintiff's proprietary information, together with the labor and expertise provided by Plaintiff to Defendants at Plaintiff's request.

103.   As a direct result of Defendants' aforesaid wrongful conduct, Plaintiff is entitled to:  (a) compensatory damages in an amount to be determined at trial; and (b) disgorged profits representing the amount obtained by Defendants in operating their e-commerce business, including *Sunday Service*.

## SEVENTH CLAIM FOR RELIEF

**Quantum Meruit**
**(*Against All Defendants*)**

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

104.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

105.   As alleged herein, MYC conferred benefits on Defendants, at Defendants' request, in the form of proprietary information, labor, and expertise.

106.   It would be inequitable for Defendants not to pay for the benefits conferred on them by MYC.  Plaintiff incurred more than $7 million in labor and expenses to do the work that Defendants requested, as well as hundreds of thousands of dollars in expenses and capital outlays, which benefitted Defendants.

107.   As a direct result of Defendants' aforesaid wrongful conduct, Plaintiff is entitled to: (a) compensatory damages in an amount to be determined at trial; and (b) disgorged profits representing the amount obtained by Defendants in operating their e-commerce business, including *Sunday Service*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff MyChannel, Inc. respectfully requests that this Court enter judgment against Defendants as follows:

(1)   On all Claims for Relief, compensatory damages in an amount to be determined at trial.

(2)   On the First Claim for Relief, (a) disgorged profits representing the amount obtained by Defendant Yeezy in operating its e-commerce business, including *Sunday Service*; and (b) reasonable attorneys' fees pursuant to Section 13 of the Parties' NDA

(3)     On the Second, Sixth, and Seventh Claims for Relief, disgorged profits representing the amount obtained by both Defendants in operating their e-commerce business, including *Sunday Service*;

(4)     On the Third, Fourth, and Fifth Claims for Relief, (a) disgorged profits representing the amount obtained by Defendant West in operating his e-commerce business, including *Sunday Service;* and (b) punitive damages;  and

(5)     On all Claims for Relief, reasonable costs, and such other and further relief as this Court deems just and proper.

///

///

///

///

///

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38(a).


DATED:  August 25, 2020                    **By:**


                                                 /s/ Ben J. Meiselas

                                           **GERAGOS & GERAGOS, APC**
                                           MARK J. GERAGOS, Esq.
                                           BEN J. MEISELAS, Esq.
                                           MATTHEW M. HOESLY, Esq.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

644 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 625-3900
Facsimile: (213) 232-3255

and,

**ZUMPANO   PATRICIOS   &   POPOK,
PLLC**

   /s/ Michael S. Popok

MICHAEL S. POPOK, Esq.
(*Pro Hac Vice* Pending)
MITCHELL MANDELL, Esq.
(*Pro Hac Vice* Pending)
417 Fifth Avenue, Suite 826
New York, New York 10016
Telephone: (212) 381-9999
Facsimile: (212) 320-0332

*Attorneys for Plaintiff*, MyChannel, Inc.